USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/29/2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MICHELET CHARLES and CAROL SMALL,

                    Plaintiffs,

    -against-

COUNTY OF ORANGE, NEW YORK; COUNTY
OF ORANGE SHERIFF'S DEPARTMENT;
ORANGE COUNTY DEPARTMENT OF MENTAL
HEALTH; NICOLE KAYE, Clinic Director, Orange
County Correctional Facility, *in her individual
capacity*; CARMEN ELIZONDO, former Clinic
Director, Orange County Correctional Facility, *in her
individual capacity*,

                    Defendants.

---

No. 16-CV-5527 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

Plaintiffs Michelet Charles ("Charles") and Carol Small ("Small"), (collectively, "Plaintiffs"), bring this action pursuant to 42 U.S.C. § 1983, alleging that their due process rights were violated when defendants allegedly failed to provide them with discharge plans upon release.[1] Plaintiffs seek damages against the following defendants: the County of Orange ("Orange County"), the County of Orange Sheriff's Department (the "Sheriff's Office"),[2] the Orange County Department of Mental Health (the "Mental Health Department"), and the Mental Health Department's clinical directors, both current (Nicole Kaye) and former (Carmen Elizondo), in their

---

[1] Plaintiffs do not claim they were denied treatment while in custody, in fact they both concede that they received adequate and regular mental healthcare during detention at the Orange County Correctional Facility. (*See* Compl. ¶ 2.) "As a result of … treatment" "Plaintiffs were stable and regularly taking appropriate medication" "before being released from civil immigration detention." (*Id.*) Rather the gravamen of the Complaint hinges on whether Defendants are liable for failing to provide Plaintiffs with a discharge plan upon release from the facility. If so, Defendants abruptly interrupted Plaintiffs' mental healthcare in violation of their constitutional rights.

[2] The Court will refer to the County of Orange Sheriff's Department based on Defendants' claim that "[t]here is no County department called the 'Sheriff's Department,' thought there is a Sheriff's Office." (Defs.' Cty. Orange, Orange Cty. Sheriff's Office, Orange Cty. Dep't Mental Health, and Elizondo Mem. Law Supp. Mot. Dismiss (ECF No. 48) ("County Defs'. Mem") at 8 n.6).

individual capacities.  According to the Complaint, defendants failed to provide Charles and Small, who were receiving psychiatric care and treatment in detention, with discharge plans.  Discharge plans are generally created prior to an individual's release from a provider's care and designed to guard against relapse, prevent hospitalizations, and decrease the risks of instability.  (*See* Complaint (ECF No. 2) ("Compl.") ¶ 1.)

Defendants now move to dismiss all claims.  Orange County, the Sheriff's Office, the Mental Health Department, and Elizondo, (collectively, the "County Defendants"), each move to dismiss the Complaint for failure to state a claim.  *See* Fed. R. Civ. P. 12(b).  Kaye moves for judgment on the pleadings, *see* Fed. R. Civ. P. 12(c).  For the reasons that follow, the Court grants each motion and dismisses all of Plaintiffs' claims.

## I.      BACKGROUND[3]

### A. Parties

Plaintiffs Charles[4] and Small are "individuals who suffer from serious, ongoing mental illnesses."  (Compl. ¶ 1.)  They allege mainly that Orange County's institutional entities and its employees acted "unconstitutional[ly]," "in failing to provide [them] any discharge planning when they were released from civil immigration detention."  (*Id.*)  "Discharge planning is an essential part of mental healthcare in institutional settings," and consists of a plan "created prior to release … from a provider's care," "to ensure" individuals "do not relapse …, face hospitalization,

---

[3] The facts related therein are drawn primarily from the Complaint filed by Charles and Small, (*see generally* ECF No. 1), and the materials it references.  *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.").  The Courts accepts all factual allegations in the Complaint as true and construes them in the light most favorable to Charles and Small, the non-moving parties.  *See, e.g., Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013); *Gonzalez v. Hasty*, 651 F.3d 318, 321 (2d Cir. 2011).  With respect to Kaye's Rule 12(c) motion for judgment on the pleadings, the Court draws, as it may, from "the complaint, the answer, [and] any written document attached to them[.]"  *Roberts v. Babkiewicz*, 582 F.3d 418, 419 (2d Cir. 2009).

[4] Before Charles was detained, he resided in New York State.  As of March 12, 2016, when the Complaint was filed, Charles resided in Riverdale, Georgia.  (Compl. ¶ 8.)

increased risk of suicide, homelessness, and other related instability." (*Id*.) Because inmates are "forced to rely on Defendants" for "adequate medical care," defendants' omissions here "created a substantial risk that Plaintiffs would relapse," a failure that allegedly falls below the "minimally acceptable constitutional standards of institutional mental healthcare." (*Id*. ¶ 6.) This omission, which Plaintiffs allege rises to the level of a "widespread custom, and unofficial policy" of "depriv[ing] [those] with mental illness," from "critical treatment" (*id*. ¶ 6), similarly falls below the practice adopted by other jails (e.g., Rikers) and recent federal guidance (from the Immigration and Customs Enforcement Agency ("ICE")), (*id*.).[5] Defendants' failure to provide discharge planning constitutes a deliberate indifference to Plaintiffs' serious medical needs in violation of the Fourteenth Amendment. (*Id*. ¶ 7.)

The institutional defendants are the County, the Sheriff's Department, and the Mental Health Department. The County is sued based on their supervision of the Orange County Detention Center where Plaintiffs were detained pending their immigration removal hearings. "Orange County operates [the] detention center, and through its senior officials, promulgates and implements policies with respect to the provision of mental healthcare" of inmates. (Compl. ¶ 10.) In addition, "senior officials within the County," "are aware of and tolerate the practice of failing to provide discharge planning."(*Id*. ¶ 10.) The Sheriff's Department is sued based on its status as the "signatory to an Inter-Government Services Agreement between ICE and Orange County." (*Id*. ¶11.) The Mental Health Department is sued based on "providing mental health services to people confined in [the] detention center," "pursuant to the Inter-Governmental Services Agreement between ICE and Orange County."[6] (*Id*. ¶ 12.)

---

[5] According to the Complaint, ICE – the federal agency that contracts with Orange County to confine civil immigrant detainees – requires discharge planning. (Compl. ¶ 6.)

[6] The County Defendants assert that since 2008, Orange County has contracted with the federal government "to house civil immigration detainees while the await deportation." (County Defs.' Mem. at 5.)

The individual defendants are the Mental Health Department's two clinical directors, Nicole Kaye ("Kaye") and Carmen Elizondo ("Elizondo"). Both Kaye and Elizondo are sued based on their supervising the clinic's employees,[7] who were required to provide inmates with "appropriate mental healthcare." (Compl. ¶¶ 13, 30, 81.) More specifically, both Kaye and Elizondo and the employees they supervised, "failed to arrange for the provision of any medication" to Charles or Small "at the time of [their] release or thereafter." (*Id*. ¶ 52, 82.) Kaye was the acting director at the time Charles was released and Small was detained, while Elizondo, who preceded Kaye, was the acting director during the time Charles was confined. (*Id*. ¶¶ 13-14.)

## B. Facts as to Charles

Generally, both Charles and Small were held in "civil immigration detention,"[8] where "each received regular mental healthcare." (Compl. ¶ 2.) This care, which proved effective in stabilizing plaintiffs, consisted of routine meetings with psychiatrists and psychotropic medications "for serious mental illnesses" that "could not be stopped abruptly without serious consequences." (*Id*. ¶¶ 2-3.) Nevertheless, Defendants "abruptly" interrupted this serious care by releasing Plaintiffs without, *inter alia*, a referral for ongoing psychiatric care or, at the very least, "interim medications" to hold them over for "a few days until they could access new care." (*Id*. ¶ 2.)

Charles, a U.S. lawful permanent resident, suffers from "bipolar and schizoaffective disorders," (*id*. ¶¶ 3, 23), and requires a "daily prescription regimen to manage" them, (*id*. ¶ 31).

---

[7] "According to the 2013 Compliance Inspection of the Office of Detention Oversight at the Department of Homeland Security, Orange County Detention Center's mental health department consists of a full time mental health director, two staff psychiatrists, and one psychiatric nurse practitioner." (Compl. ¶ 124.)

[8] The Complaint states that Plaintiffs in civil immigration detention centers "are subject to jail-like conditions while they await the outcome of their civil immigration removal and deportation cases." (Compl. ¶ 19.) Detainees are individuals who "may have completed a criminal sentence by the time they are confined to immigration detention, or may not have been required to serve any sentence at all." (*Id*.) The County Defendants admit that "[t]he United States Department of Homeland Security contracts with Orange County to house ICE detainees at the Jail." (County Defs.' Mem. at 2 n.2; *see also* Ex. A. ¶ 19.)

Left untreated, "these illnesses cause [] Charles to suffer from … symptoms such as hallucination and delusions … periods of mania and depression." (*Id*. ¶ 23.) On July 25, 2014, he was confined "for almost a year" (i.e., 363 days) in a civil immigration detention facility within Orange County, (*id*. ¶ 3), "pending the outcome of his removal proceeding," (*id*. ¶ 26). "When [] Charles entered [the detention center], medical personnel at the facility medically evaluated … and diagnosed him with bipolar disorder with psychotic features." (*Id*. ¶ 27.) During his detention, Orange County "provided [Charles] with coordinated psychiatric care and psychotropic medication," (*id*. ¶¶ 3, 29), "as required by the Inter-Governmental Services Agreement," (*id*. ¶ 28). Specifically, medical employees of the Mental Health Department, "overseen by Defendants Kaye and Elizondo, prescribed Risperdal and Zyprexa," which was administered to Charles "on a daily basis." (*Id*. ¶ 30.) "According to [the] medical records, Defendant Elizondo signed Charles' treatment plan," during the time he was confined. (*Id*. ¶ 30.) The medical records confirm "that while [in detention], [] Charles was psychiatrically stable," (*id*. ¶ 31), because of the treatment plan. Charles himself confirmed the "regimen was 'therapeutic,' meaning it alleviated his symptoms." (*Id*. ¶ 32.)

On July 22, 2015, Charles appeared for an immigration merits hearing, immediately after which he was "released onto the streets of lower Manhattan with his identification and nothing more." (*Id*. ¶ 3.) Despite being "aware," it was possible for Charles to be released immediately after the hearing, defendants failed to provide him with a discharge plan. (*Id*. ¶¶ 34-35.) More specifically, defendants failed to provide Charles "or his immigration attorney with a written discharge plan, a list of his medications, a supply of medication, a list of outside referrals, a list of providers for continuing care, his belongings (clothing), [or the] money he had in commissary …." (*Id*. ¶ 37.) Defendants additionally failed to "contact any pharmacy to arrange" prescriptions, (*id*.

¶ 43), or even – at the very least – provide him or his immigration attorney "with information about his prescriptions," (presumably they failed to even list the medication names, prescription strength, or dose) (*id*. ¶¶ 35, 41-42). Because Charles was released without "a single referral to a mental healthcare provider," or "interim medication" that the Mental Health Department ad prescribed him all year, his deportation officer advised him to return to the detention center "the very next day" – which Charles, accompanied by his daughter, did. (*Id*. ¶¶ 3, 44.) After traveling the "65 miles," (*id*. ¶ 40), back to the detention center, Charles and his daughter were turned away without any of "the resources necessary to obtain care," and "[he] quickly spiraled downward" as a result, (*id*. ¶ 3). The detention center's attendant "stated that the person who had transported [] Charles to … immigration court was responsible for providing a continuing supply of medication," and "also stated that as a matter of institutional policy," the detention center "can no longer provide medication" "after a person is released from its custody." (*Id*. ¶¶ 45-46.) Because Charles and his daughter were unsuccessful in obtaining resources to bridge the gap in his care, Charles's immigration attorney contacted the deportation officer to make the same request, an inquiry that said officer ignored. (*Id*. ¶ 47.)

Charles was unable to access his health insurance upon release because he was in detention on the date he was required to renew it. (*Id*. ¶ 54.) Within a two week span Charles had "suffered total psychiatric decompensation," (*id*. ¶ 3), and by August 4, 2015, (*id*. ¶ 57), he was admitted "incoherent, hallucinating, and suicidal," to a psychiatric hospital's inpatient care where he remained "for almost two months," (*id*. ¶ 53). During this time, "he was separated from his family and community while he was undergoing intense medical treatment." (*Id*. ¶ 59.) Charles "rebound[ed] to his baseline," "after 56 days in South Oaks Hospital," and was discharged on October 9, 2015. (*Id*. ¶¶ 60-61.)

### C. Facts as to Small

Small, a U.S. lawful permanent resident, suffers from "paranoid schizophrenia." (Compl. ¶ 3.) On May 14, 2014, she was confined "for eight months" in a civil immigration detention facility within Orange County. (*Id*. ¶ 5.) During her detention, she was treated with "coordinated psychiatric care and psychotropic medication," for "extreme symptoms," including paranoia. Unlike Charles, who was aware of and received treatment for his disorders before he was detained, Small "began experiencing symptoms of mental illness," "while in detention." (*Id*. ¶ 66.) Specifically, around June 2015 she experienced "visual and auditory hallucinations," and extreme paranoia and delusions. (*Id*. ¶¶ 66-67.) "She believed she was being monitored by the government through a chip implanted in her tooth, that there was a government conspiracy to poison her, and that the poison was coming through the vents." (*Id*. ¶ 67.) Small complained of these fears in letters she wrote to the sheriff and deportation officers and in calls she made to the ICE hotline. (*Id*.) In late June 2015, a psychiatrist at the detention center diagnosed Small with paranoid schizophrenia. (*Id*.) By September 8, 2015, Small's condition had worsened so severely that she was transferred "to the inpatient psychiatric ward at Kings County Hospital ("Kings") for" more "intensive treatment." (*Id*. ¶ 68.) A month later, on October 15, 2015, Small was sufficiently stable to be transferred from Kings back to the detention center where the Medical Health Department's employees, "overseen by Defendant Kaye," continued to provide Small with "medically necessary treatment." (*Id*. ¶¶ 69-70.) By the time of her release, Small's prescription "regimen consisted of [daily doses of] Trazodone, Benztropine, and Olanzapine." (*Id*. ¶ 73.) Small's condition was stable on this regimen. (*Id*. ¶ 74.)

On January 11, 2016, an immigration judge ordered that Small be released as stipulated between her counsel and ICE. (*Id*. ¶ 76.) On January 19, 2016, Small was released from the facility

without a discharge plan, this time "at approximately 6:30 at night," (*id.* ¶ 5), "in below-freezing temperatures," (*id.* ¶ 77), with only eighty dollars in cash," (*id.* ¶ 5). Defendants failed to provide Small with "a written discharge plan, a list of her medications, or a list of outside referrals or providers for continuing care," despite having advance notice – a full week – of Small's exact release date. (*Id.* ¶¶ 78-79.) At approximately one in the morning she arrived in Manhattan, where she spent the night inside a diner. (*Id* ¶ 5.) "[D]ays after her release, she checked herself into a hospital emergency room." (*Id.*)

### D. Procedural History

On July 12, 2016, Charles and Small filed the Complaint claiming constitutional deprivations and seeking compensatory and punitive damages for the injuries alleged. (ECF No. 1, "Relief Requested" Sec.). On August 9, 2016, Orange County, the Sheriff's Office, the Mental Health Department, and Elizondo (collectively, the "County Defendants") jointly filed an answer. (ECF No. 29.) On August 9, 2016, Kaye separately filed an answer. (ECF No. 30.) On October 19, 2016, the Court held a pre-motion conference and set a schedule for the filing of the ensuing motions.

On January 30, 2017, the County Defendants filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). (ECF No. 46.) These defendants also filed a joint memorandum of law covering common legal issues. (Defs.' Cty. Orange, Orange Cty. Sheriff's Office, Orange Cty. Dep't Mental Health, and Elizondo Mem. Law Supp. Mot. Dismiss (ECF No. 48) ("County Defs'. Mem.").) On January 30, 2017, Kaye filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(c), (ECF No. 50), and a memorandum of law in support, (ECF No. 51 ("Def. Kaye's Mem.).) On January 30, 2017, Plaintiffs opposed the motions, (ECF No. 59), and County Defendants and Kaye filed separate replies, (ECF Nos. 54 & 56, respectively). On January 31, 2017, the Court denied

Plaintiffs' request for oral argument, (*see* ECF No. 64), and on April 19, 2017, it approved a joint stipulation regarding procedures to be followed in handling confidential information, (*see* ECF No. 67).

## I.     DISCUSSION

Generally, Plaintiffs allege that defendants violated his and her constitutional rights to be free from deliberate indifference in providing discharge plans upon release. (Compl. ¶¶ 6, 26, 33-43, 65, 76-84, 142, 155.) Plaintiffs bring three claims under § 1983: (1) a *Monell* claim against the County of Orange, the Sheriff's Office, and the Mental Health Department, alleging that those defendants' policy, practice, and custom was to provide constitutionally inadequate healthcare to persons held in civil immigration detention; (2) a claim against all defendants for deliberate indifference in providing medical care to Charles and Small upon discharge from the facility; *and* (3) supervisory liability claims against Elizondo and Kaye.

As noted, the pending motions are to dismiss under Rules 12(b)(6) and 12(c), on various grounds, some global, others made only by individual defendants or groups. The moving defendants globally argue that there is no established substantive due process right to post-release measures inherent in discharge plans. According to this view, the state's duty of care ends the instant an inmate walks through the prison gates and into the civilian world because that is the moment when a person's ability to secure medication or care on his and her own behalf is restored. The institutional defendants argue the Complaint does not adequately allege municipal liability under *Monell* or deliberate indifference as to Plaintiffs' medical care. The individual defendants argue that the Complaint does not adequately allege the required elements for liability under § 1983 for violations of plaintiffs' constitutional rights; and that they are entitled to qualified immunity.

**A. Standard of Review – Rules 12(b)(6) and 12(c)**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Ashcroft*, 556 U.S. at 678. (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss, a district court must "accept[ ] all factual claims in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010) (internal quotation marks omitted)). However, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[R]ather, the complaint's *[f]actual* allegations must be enough to raise a right to relief above the speculative level, *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555, 570) (internal quotation marks omitted) (emphasis in *Arista Records*). A complaint is properly dismissed where, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

As for a motion for judgment on the pleadings under Rule 12(c), "[a] motion to dismiss under Rule 12(c) is governed by the same standard as a motion under Rule 12(b)(6)." *In re Ades*

*and Berg Grp. Inv'rs*, 550 F.3d 240, 243 n.4 (2d Cir. 2008) (citation omitted). As such, the district court accepts all allegations in the complaint as true, draws all reasonable inferences in the plaintiffs' favor,[9] and properly dismisses the complaint when the allegations in the complaint fail to raise an entitlement to relief above the speculative level. *Id; see also Graziano v. Pataki*, 689 F.3d 110, 114 (2d Cir. 2012) ("To survive a Rule12(c) motion, the complaint must contain sufficient factual matter to 'state a claim to relief that is plausible on its face.'").

### B. Motions to Dismiss § 1983 Claims for Failure to State a Claim

Plaintiffs sue the County Defendants under § 1983 for allegedly violating their federal rights, specifically deliberate indifference to Plaintiffs' due process rights. (Compl. ¶¶ 1, 6-7.) The Complaint alleges that the defendants directly violated plaintiffs' constitutional right to adequate medical care, which includes discharge planning. It also alleges that Elizondo and Kaye directly participated in the deprivation of plaintiffs' rights and they are also personally liable for these deprivations on other theories of personal liability recognized under § 1983. The County Defendants move to dismiss on the grounds the Complaints factual allegations do not adequately plead deprivations of federal rights by means of deliberate indifference.

Section 1983 provides redress for a deprivation of federally protected rights by persons acting under color of state law. 42 U.S.C. § 1983. To prevail on a § 1983 claim, a plaintiff must establish (1) the violation of a right, privilege, or immunity secured by the Constitution or laws of the United States (2) by a person acting under the color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Flagg Bros., Inc., v. Brooks*, 436 U.S. 149, 155-56 (1978).[10]

---

[9] *See also Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010).

[10] It is undisputed that the individual defendants, all of whom were employees of the County's Mental Health Department, were persons acting under color of state law within the meaning of § 1983.

The personal involvement of a defendant sued in his or her individual capacity is a requirement for liability under § 1983; a defendant's supervisory authority is insufficient in itself to create liability under § 1983. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). "To proximately cause a … due process violation … a defendant must be personally involved in the violation. A plaintiff may establish such personal involvement by making any one of five showings (the '*Colon* factors')." *Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).[11] These showings are as follows: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the plaintiffs] by failing to act on information that unconstitutional acts were occurring." *Id.* (quoting *Colon*, 58 F.3d at 873); *see also Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004) ("[A] plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his [or her] individual capacity under § 1983. Personal involvement ... includes not only direct participation in the alleged violation but also gross negligence in the supervision of subordinates who committed the wrongful acts and failure

---

[11] The Second Circuit has not squarely addressed how *Iqbal* affects the standards in *Colon* for establishing supervisory liability. It recently observed, the limitation on supervisory liability in *Iqbal* "has, of course, engendered conflict within our own Circuit about the continuing vitality of the supervisory liability test set forth in *Colon* ...." *Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2d Cir. 2012); *see Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (noting that *Iqbal* may have "heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations" but not reaching the impact of *Iqbal* on *Colon* because the complaint "did not adequately plead the [w]arden's personal involvement even under *Colon*."); *see also Aguilar v. Immigration & Customs Enforcement Div.*, 811 F. Supp. 2d 803, 814 (S.D.N.Y. 2011) ("The Court of Appeals has not yet definitively decided which of the *Colon* factors remains a basis for establishing supervisory liability in the wake of *Iqbal*, and no clear consensus has emerged among the district courts within the circuit.").

to take action upon receiving information that constitutional violations were occurring.") (citations omitted)).[12]  The Court elaborates below on the standards governing deliberate indifference because the Complaint's theory of liability for defendants rests, in part, on such grounds.  (Compl. ¶¶ 7, 145, 158.)

     1.  *Plaintiff's Inadequate Medical Care Claims*

The claims here depend on a single threshold question: did the defendants' actions violate plaintiffs' constitutional rights?  If they did not, then the defendants cannot be liable to Charles and Small under § 1983, regardless of whether defendants acted pursuant to a municipal policy or custom.  *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam).  Furthermore, if Charles and Small have no valid claim under § 1983 against any defendant, the Court cannot reach the question of whether individual defendants were deliberately indifferent to plaintiffs' medical needs, despite the egregious character of the facts alleged here.  The Court therefore begins with the most substantive question of whether the defendants' conduct infringed on Plaintiffs' constitutional rights.

Among the liberties protected by the Due Process Clause of the Fourteenth Amendment is "a right to be free from … unjustified intrusions on personal security."  *Ingraham v. Wright*, 430 U.S. 651, 673 (1977).  But in *DeShaney v. Winnebago Cty. Dep't of Soc. Srvs.*, the Supreme Court observed that "nothing in the language of the Due Process Clause itself requires the State to protect

---

[12] In *Iqbal*, the Supreme Court held that "[b]ecause vicarious liability is inapplicable to … [section] 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. 662, 676 (2009).  In so holding, the Court explicitly rejected the argument that, "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Id*. at 677.  Thus, the Court concluded that "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."  *Id*.  The Court went on to note that the required showing of personal involvement "will vary with the constitutional provision at issue"; as the plaintiff's claim in *Iqbal* was for "invidious discrimination" in violation of the First Amendment and Equal Protection Clause, "the plaintiff must plead and prove that the defendant acted with discriminatory purpose."  *Id*. at 676.  Accordingly, the Court rejected the plaintiff's theory that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution."  *Id*. at 677.

the life, liberty, and property of its citizens against invasion by private actors." 489 U.S. 189, 195 (1989) (the seminal case on substantive due process where the Supreme Court considered "when, if ever, the failure of a state of local government entity or its agents to provide an individual with adequate protective services constitutes a violation of the individual's due process rights.") As a result, the Court held that the Clause "generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id.* at 196.

The Second Circuit has "recognized two exceptions to this general principle, rooted in the Supreme Court's analysis in *DeShaney*." *Matican v. City of New York*, 524 F.3d 151, 155 (2d Cir. 2008). First, the state may owe such an obligation if its agents "in some way had assisted in creating or increasing the danger to the victim." *Dwares v. City of New York*, 985 F.2d 94, 98-99 (2d Cir. 1993) (citing *DeShaney,* 489 U.S. at 201, 203), *overruled on other grounds by Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993). Second, the state or its agents may owe a constitutional obligation to the victim of private violence if the state had a "special relationship" with the victim. *Id.* (citing *Ying Jing Gan v. City of New York*, 996 F.2d 522, 533 (2d Cir.1993) (internal citations omitted)). Even if Plaintiffs' claims fall within one of these two exceptions, and the defendants' behavior violated a constitutional obligation, Charles and Small "face an additional hurdle: he [and she] must show that the defendants' behavior was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Matican*, 524 F.3d at 155 (quoting *Cty. of Sacramento v. Lewis,* 523 U.S. 833, 848 n.8 (1998)). "This requirement screens out all but the most significant constitutional violations, 'lest the Constitution be demoted to … a font of tort law.'" *Matican*, 524 F.3d at 155 (quoting *Paul v. Davis*, 424 U.S. 693, 701 (1976)).

### a. State-created danger exception

"[T]he state-created danger exception arises from the Court's analysis in *DeShaney*." *Matican*, 524 F.3d at 157. After explaining that no special relationship existed between the state and petitioner, the Court emphasized that government officers had done nothing worse than failing to take action even though suspicious circumstances may have counseled an active role. *DeShaney*, 489 U.S. at 203. It concluded that, by negative implication, the state does infringe a victim's due process rights when its officers assist in creating or increasing the danger that the victim faced at the hands of a third party." *Matican*, 524 F.3d at 157 (quoting *Dwares*, 985 F.2d at 99).

Plaintiffs' claims do not implicate the "state created danger" exception because they have not alleged that they were victim of any private violence, so the Court addresses only the special relationship exception.

### b. Special relationship exception

The special relationship[13] exception grows from the *DeShaney* Court's observation that "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals," such as incarcerated prisoners and involuntarily committed mental patients. [14] *Deshaney*, 489 U.S. at 198; *see also Youngberg v.*

---

[13] The Supreme Court had described this relationship as follows:

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.... The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic needs – e.g., food, clothing, shelter, medical care, reasonable safety – it transgresses the substantive limits on state action set by the … Due Process Clause.

*Deshaney*, 489 U.S. at 199-200 (italics omitted).

[14] The Supreme Court noted that the situation of a child placed in foster care might be sufficiently analogous to those of prisoners or mental patients to trigger the exception, but it did not decide the question. *Id*. at 201 n.9.

*Romeo*, 457 U.S. 307 (1982) (duty to provide necessary health services to involuntarily committed patients); *Estelle v. Gamble*, 429 U.S. 97 (1976) (duty to provide adequate medical care to incarcerated prisoners). Under these limited circumstances, "the state may owe the incarcerated person an affirmative duty to protect against harms to his [or her] liberties inflicted by third parties." *Matican*, 524 F.3d at 155-56 (2d Cir. 2008).

In determining whether a duty arises under this exception, defendants assert that they do not have "a duty under the Fourteenth Amendment to provide services, such as medications, referrals, or other discharge planning, to those who are *not* in its custody." (County Defs.' Mem. at 12) (emphasis in original); (*see also* Def. Kaye's Mem. ¶¶ 18-20). Stated differently, "when an individual is not in the involuntary custody of the government, the government has no duty to provide continuing care once that person is free to find his or her own treatment." (County Defs.' Mem. at 13.) "And even if the Court finds, for the first time, that this right exists," Defendants maintain that "Plaintiffs failed to allege facts showing the defendants had the requisite culpable state of mind." (*Id*. at 12; *see also* Def. Kaye's Mem. ¶ 24.)

Defendants recognize that neither the Supreme Court nor the Second Circuit have addressed whether the Due Process clause includes a right to post-release measures inherent in discharge planning and suggest that *Deshaney* "readily" defines the scope of the Fourteenth Amendment. (County Defs.' Mem. at 14; Def. Kaye's Mem. ¶ 20.) The County Defendants propose that because the Supreme Court held that the Fourteenth Amendment does not require states to provide citizens with particular protective services, "it follows that the State cannot be held liable under the [Equal Protection] Clause for injuries that could have been averted had it chosen to provide them." (County Defs.' Mem. at 14) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196-97 (1989)). While the Fourteenth Amendment requires a

correctional facility to provide medical care to detainees while they are in the state's custody – meaning that the "prisoner is unable by reason of the deprivation of liberty to care for himself" – the state's duty does not extend beyond release. (County Defs.' Mem. at 14; Def. Kaye's Mem. ¶¶ 18-19) (citing *Deshaney*, 489 U.S. at 199-200).

The Court agrees with defendants that the Second Circuit "opinions have also focused on involuntary custody as the linchpin of any special relationship exception,"[15] *see Matican*, 524 F.3d at 156 (collecting cases), but it notes that most often the due process claims arise in the child-removal context. *See Estate of M.D. by DeCosmo v. New York*, 241 F. Supp. 3d 413, 428 (S.D.N.Y. 2017). In the context of a prisoner's release from custody, some courts have suggested that the state does maintain some, if very limited, duties.[16] *See, e.g., Lugo v. Senkowski*, 114 F. Supp. 2d 111, 115 (N.D.N.Y. 2000) ("The State has a duty to provide medical services for an outgoing prisoner who is receiving continuing treatment at the time of his release for the period of time reasonably necessary for him to obtain treatment on his own behalf.") (quoting *Wakefield v. Thompson*, 177 F.3d 1160, 1164 (9th Cir. 1999)); *But see Bright v. Westmoreland Cty.*, 380 F.3d 729, 736-37 (3d Cir. 2004) (rejecting a Section 1983 claim by the father of a murder victim that the state "should have taken the affirmative step of arresting and/or incarcerating [the murderer] for an alleged probation violation" before the murder, because the state has no "continuing duty" to prevent a parolee "from ever committing any other crime"). While Defendant Kaye, for

---

[15] *See Lombardi v. Whitman*, 485 F.3d 73, 79 n. 3 (2d Cir. 2007) ("Special relationships arise ordinarily if a government actor has assumed an obligation to protect an individual by restricting the individual's freedom in some manner, as by imprisonment."); *Suffolk Parents of Handicapped Adults v. Wingate*, 101 F.3d 818, 824 (2d Cir. 1996) (holding that plaintiffs' claim did not fall within *DeShaney* exception because "the plaintiffs here … are not involuntarily institutionalized"); *see also Doe v. N.Y.C. Dep't of Soc. Servs.*, 649 F.2d 134, 141 (2d Cir. 1981) (holding that state is liable under Due Process Clause for abuse suffered by child in foster care, and emphasizing custodial nature of foster care placement).

[16] Whether or not a release from physical custody relieves a state of the duty it had assumed may depend upon the circumstances surrounding the release. *Johnson v. Florida*, 348 F.3d 1334, 1346 (11th Cir. 2003) (citing *Wakefield v. Thompson*, 177 F.3d 1160 (9th Cir. 1999); *Davis v. Brady*, 143 F.3d 1021 (6th Cir. 1998); *see also Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1039 n.19 & 20 (11th Cir. 2001).

instance, recognizes this duty, she argues that the "a duty to ensure medical care after an individual is released from custody … [m]ay be good practice, but it is not a duty imposed by the Fourteenth Amendment." (Def. Kaye's Mem. at ¶ 20.)

In *Wakefield v. Thompson*, 177 F.3d 1160 (9th Cir. 1999), the Ninth Circuit addressed this issue in holding that a parolee requiring medication beyond his release was owed an affirmative duty by the state. The court there held that "a prisoner's ability to secure medication 'on his own behalf' is not restored the instant he walks through the prison gates and into the civilian world." *Id.* at 1164. The court reasoned that, because it could take parolees a number of days or even weeks to obtain new medication, "the period of time during which prisoners are unable to secure medication 'on their own behalf' may extend beyond the period of actual incarceration." *Id.* Accordingly, the court held that the state was required to provide him with enough medication to cover the period of time "reasonably necessary to permit him to consult a doctor and obtain a new supply." *Id.* Find this reasoning persuasive, the court in *Lugo v. Senkowski*, 114 F. Supp. 2d 111, 114-15 (N.D.N.Y. 2000), held that the state's duty extended to a plaintiff who – released on parole – was instructed by his treating physician that follow up surgery within several weeks was needed to remove the metal stent still inside his body. In *Lugo*, defendant was accused of preventing plaintiff from returning to the facility to have the follow up surgery performed by his treating physician.

Civil detainees, like the inmates in *Wakefield* and *Lugo*, just having been released after a stay in prison are often in no position to immediately find the alternative medical attention that they require. Here, the facts alleged support a claim the claim that plaintiffs were unable to obtain the necessary treatment "on his [and her] own behalf" and that the state had a continuing duty to protect them for a reasonable amount of time. This is particularly true of Small because the course

18

of treatment started while she was incarcerated.  It seems unreasonable that she, a person who had

never grappled with her illness prior to detention and developed such a severe paranoia that the

facility itself transferred her to a hospital for "intensive treatment," would not medically require a

discharge plan in the days and few weeks after her release.  (Compl. ¶¶ 66-68.)  At the time when

she was released, the detention facility staff were Small's first and only physicians.  By contrast,

Charles had successfully managed his condition before being detained, but he nonetheless

affirmatively denied assistance upon returning to the facility and requesting interim medications.

Moreover, because Charles was unable to access his health insurance upon release because he was

in detention on the date he was required to renew it, (*id*. ¶ 54), the state's custody placed him in a

worse position than that in which he would have been had it not acted at all.  *See DeShaney*, 489

U.S. at 200.   Taking the facts as alleged by Charles and Small as true, and the specific

circumstances surrounding their release, they may have been owed a limited duty of protection

beyond their periods of incarceration (a year and eight months, respectively) which was not

satisfied by the state.  Thus, the Court finds that – at this stage in the litigation – the allegations

fall within the special relationship exception.

> c.  *Shocking the conscience*

State action resulting in bodily harm is not a due process violation, even if it falls within

an exception to *DeShaney*, unless the state "action was so 'egregious, so outrageous, that it may

fairly be said to shock the contemporary conscience.'"  *Pena v. DePrisco*, 432 F.3d 98, 112 (2d

Cir. 2005) (quoting *Cty. of Sacramento v. Lewis,* 523 U.S. 833, 848 n. 8 (1998)).  Thus, it is

insufficient to allege that a state actor failed to protect an individual, even from a known danger of

bodily harm or failed to warn that individual of such danger.  *See Collins v. City of Harket Heights*,

503 U.S. 115, 125-29 (1992) (holding that there was no due process violation where the plaintiff

alleged that the city failed to properly train or warn its employees of known dangers that resulted in a sanitation worker's asphyxiation).

To establish a defendant's "deliberate indifference" to a violation of law, a plaintiff must show that the defendant acted with a sufficiently culpable state of mind. "Until very recently, the law applied the same test for 'deliberate indifference' to § 1983 claims based on underlying violations of the Eighth Amendment and the Fourteenth Amendment."[17] *D.K. by L.K. v. Teams*, No. 16-CV-3246 (PAE), 2017 WL 2889509, at *10 (S.D.N.Y. July 5, 2017). "The Second Circuit, however, in *Darnell v. Pineiro*, 849 F.3d 17, 33 (2d Cir. 2017), recently revisited this question, in light of the Supreme Court's decision in *Kingsley v. Henrdrickson*, – U.S. –, 135 S. Ct. 2466, 192 L.Ed.2d 416 (2015)." *Id.* In *Darnell*, the Second Circuit held that the formulation of the deliberate indifference standard differs depending on which Amendment the federal right flows from. *See Darnell*, 849 F.3d at 30.

Under the Eighth Amendment, a deliberate indifference claim requires that the defendant state official have possessed a reckless state of mind equivalent to the "more exacting *subjective standard* akin to that used in the criminal context … requir[ing] proof of … subjective awareness" of the constitutional violation.[18] *Darnell*, 849 F.3d at 32 (citing *Farmer v. Brennan*, 511 U.S. 825, 836-37 (1994)) (emphasis added). In contrast, for § 1983 claims arising out of violations of the

---

[17] The Court notes here that defendants relied on *Caiozzo* to claim that the standard for deliberate indifference is the same under the Fourteenth Amendment as it is under the Eighth Amendment. (*See* Def. Kaye's Mem. at 7 n.3.) This rationale was overruled by the Second Circuit after defendants submitted their respective motions. *Darnell v. Pineiro*, 849 F.3d 17, 34-35 (2d Cir. 2017) ("Following the Supreme Court's analysis in *Kingsley*, there is no basis for the reasoning in *Caiozzo* that the subjective intent requirement for deliberate indifference claims under the Eighth Amendment, as articulated in *Farmer*, must apply to deliberate indifference claims under the Fourteenth Amendment. *Caiozzo* is thus overruled to the extent that it determined that the standard for deliberate indifference is the same under the Fourteenth Amendment as it is under the Eighth Amendment.")

[18] The Second Circuit explained that the reason the term "subjective prong" might be a misleading description is that the Supreme Court has instructed that "deliberate indifference" roughly means "recklessness," but "recklessness" can be defined subjectively (what a personal actually knew, and disregarded), or objectively (what a reasonable person knew, or should have known). *See Darnell*, 849 F.3d at 29; (citing *Framer v. Brennan*, 511 U.S. 825, 836-37 (1994)).

Fourteenth Amendment, the defendant state official must have acted with *objective* recklessness with respect to the violation. *Darnell*, 849 F.3d at 35. The plaintiff must show only that "the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the [] detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety"; the *mens rea* required for a deliberate indifference claim of this nature "is defined objectively." *Id.* This standard for deliberate indifference applies to any underlying violation of the due process clause, such as for maintaining unconstitutional conditions of confinement or failing to provide adequate medical care to a person in state custody, "because deliberate indifference means the same thing for each type of claim under the Fourteenth Amendment." *Id.* at 33 n.9.

The Supreme Court in *Estelle* cautions that mere negligence is not actionable. *See Frank v. Cty. of Ontario*, 884 F. Supp. 2d 11, 18 (W.D.N.Y. 2012). "A [prisoner's] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eight Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106. Rather, the plaintiff must allege conduct that is "repugnant to the conscience of mankind," *id.* at 102, or "incompatible with the evolving standards of decency that mark the progress of a maturing society," *id.* at 105–06. While it is very clear to this Court, then, that allegations of malpractice alone do not state a constitutional claim,[19] a close and difficult question remains: where do the claims, as alleged, fall on the spectrum between mere negligence and unconstitutional deprivations?

---

[19] *Estelle*, 429 U.S. at 106 n.14; *Chance,* 143 F.3d at 703-04; *Ross,* 784 F.Supp. at 44.

Ultimately, the Court finds that, from an objective standpoint, the temporary deprivation was not sufficiently harmful to establish a constitutional violation. *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir.2003) (quoted in *Goris v. Breslin,* 402 Fed.Appx. 582, 585 (2d Cir.2010)); *see also Rodriguez v. Ames,* 224 F.Supp.2d 555, 561 (W.D.N.Y.2002) ("Although a delay in medical care can demonstrate deliberate indifference to a prisoner's medical needs, a prisoner's Eighth Amendment rights are violated only where the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment") (internal quotation omitted). Here, the deliberate indifference to medical treatment may have constituted an "egregious shock" to the contemporary conscience had Plaintiffs remained in custody. To be clear, it would make sense for prison facilities to enforce policies whereby inmates with mental illness receive a discharge plan upon release, especially where the county policy requires it. Indeed other detention facilities have made a policy decision that is more prudent and perhaps more humane to provide those who bear both physical and mental illness with a discharge plan. By way of example, and as alleged by Plaintiffs, a facility on Rikers Island "began to end its similar practice of discharging people with mental illness without any psychiatric medication or treatment referrals" "almost *two decades* ago." (Compl. ¶ 6) (emphasis added). Additionally, the most recent guidance from ICE itself, the federal government agency that contracts with Orange County to confine civil immigrant detainees, requires discharge planning. (*Id*.) Nevertheless, the Court maintains that the claims are more akin to negligence or malpractice claims than constitutional violations.

While this result may seem harsh given the egregious character of the facts alleged, the Second Circuit has yet to determine that interruption in care of the nature alleged here "egregiously

shocks" the contemporary conscience, specifically when plaintiffs are not in custody and are otherwise "free" to seek out assistance for his or herself. The Second Circuit's decision in *Lombardi* is instructive here. *Lombardi v. Whitman*, 485 F.3d 73 (2d Cir. 2007) (considering the substantive due process claims of rescue and cleanup workers at the World Trade Center site following the 9/11 attacks). The plaintiffs in that case alleged that the defendants, federal environmental and workplace-safety officials, issued intentionally false press releases stating that the air in Lower Manhattan was safe to breathe, and that in reliance on those statements, the workers did not use protective gear. *Lombardi*, 485 F.3d at 75. The Second Circuit held that "regardless of whether the situation was a time-sensitive emergency, plaintiffs' allegation of deliberate indifference did not shock the conscience." *Lombardi v. Whitman*, 485 F.3d 73, 85 (2d Cir. 2007) (concluding that "[w]hen great harm is likely to befall someone no matter what a government official does, the allocation of risk may be a burden on the conscience of the one who must make such decisions, but does not shock the contemporary conscience.").

Ultimately, because the "shocks the conscience" "requirement screens out all but the most significant constitutional violations, 'lest the Constitution be demoted to … a font of tort law," *Matican*, 524 F.3d at 155 (quoting *Paul*, 424 U.S. 693, 701), the Court grants defendants' motions on this grounds.[20]

---

[20] Because Plaintiffs' claims fail upon an inquiry of the threshold issue, the Court need not address the remaining grounds for dismissal.

## CONCLUSION

For the foregoing reasons, the motion to dismiss is granted, and Plaintiffs' due process claims are dismissed. The Clerk of Court is directed to terminate all pending motions and to close this case.

Dated:    September 29, 2017  
          White Plains, New York

SO ORDERED:

_____

NELSON S. ROMÁN  
United States District Judge